UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FRANK SANTILLAN,<br><br>    Plaintiff,<br><br>v.<br><br>SOCIAL SECURITY ADMINISTRATION,<br><br>    Defendant. | Case No. 3:15-cv-01049<br><br>Judge Trauger<br>Magistrate Judge Newbern |

To the Honorable Aleta A. Trauger, District Judge

### REPORT AND RECOMMENDATION

Pending before the Court in this Social Security appeal is Plaintiff Frank Santillan's Motion for Judgment on the Administrative Record (Doc. No. 14), to which Defendant Social Security Administration (SSA) has responded (Doc. No. 16). Santillan has filed a reply. (Doc. No. 17.) Upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 10),[1] and for the reasons given below, the undersigned RECOMMENDS that the decision of the Administrative Law Judge (ALJ) be REVERSED and REMANDED.

### I. Introduction

Santillan filed an application for supplemental security income benefits under Title XVI of the Social Security Act on August 8, 2012, alleging disability onset on that date due to manic depressive disorder, high blood pressure, diabetes, and depression. (Tr. 17, 172.) The state agency denied his claim upon initial review and again following his request for reconsideration. Santillan

---

[1] Referenced hereinafter by the abbreviation "Tr."

subsequently requested *de novo* review of his case by an Administrative Law Judge, who heard the case on June 30, 2014; Santillan appeared with counsel and gave testimony. (Tr. 17, 36–67.) A vocational expert (VE) also testified. After the hearing, the ALJ took the matter under advisement until August 29, 2014, when she issued a written decision finding White not disabled. (Tr. 17–31.) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since August 8, 2012, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: large exotropia, diabetes mellitus, bipolar disorder, PTSD, and obesity (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c). The claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently. The claimant can stand and/or walk for 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. The claimant can frequently climb. The claimant should avoid tasks that require depth perception. The claimant can maintain concentration, pace, and persistence for 2 hours at a time during an 8 hour workday. The claimant can have occasional interaction with coworkers and supervisors; no interaction with the general public; and can adapt to infrequent changes in the workplace.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on July 30, 1959 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 8, 2012, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19–20, 23, 29–31.)

On July 31, 2015, the Appeals Council denied Santillan's request for review of the ALJ's decision (Tr. 1–4), rendering that decision final. This action was timely filed thereafter. 42 U.S.C. §§ 405(g), 1383(c).

## II.    Review of the Record

The ALJ summarized the medical evidence of record as follows:

Regarding the claimant's bilateral lower extremity edema, the record revealed no significant functional limitation due to this impairment (Exhibit 3F). The claimant was diagnosed with this impairment and treated without significant complications (Exhibit 3F/5). In addition, the undersigned has found evidence in the record that this condition may have been helped and/or reduced with the claimant's weight loss (Exhibit 3F and 9F) . . . .

Regarding the claimant's hypertension, the undersigned has found that this impairment was well controlled with the use of medication (Exhibits 3F and 9F). The claimant testified that he experienced a decrease in adverse symptoms when he was compl[ia]nt with his medication regimen. In addition, the record revealed no end stage organ failure or organ damage as a result of this impairment. There was also no evidence of significant inpatient hospitalization regarding this impairment.

. . .

Regarding the claimant's large exotropia, diabetes mellitus, and obesity, the undersigned has found that . . . treatment records revealed that the claimant's

diabetes was well controlled when he took the medication as prescribed and was compliant with his treatment regimen (Exhibit 3F and 9F). There was also evidence of weight loss from a high of 350 pounds to below 300 pounds with the use of proper diet and exercise (Exhibits 3F and 9F). The claimant also admitted that he experienced more adverse symptoms when he failed to take his medication as directed or failed to monitor his blood sugar. The undersigned has found this evidence consistent with treatment notes that revealed that the claimant's diabetes mellitus was controlled with medication despite the claimant's non-compliance (Exhibit 3F). Treatment records from the Lapaz Clinic from October 2012 revealed that the claimant weighed as much as 348 pounds and was not following a proper diet (Exhibit 3F/1). However, the undersigned has noted that his weight was down from 350 pounds during a visit on September 2012 (Exhibit 3F/3). During that visit in September 2012, the claimant reported that he was feeling better and had a higher energy level due to following his treatment plan that included taking his medication as directed and exercising (Exhibit 3F/3). The undersigned has noted a pattern of improvement with the claimant's overall condition from 2012 to the present time including better control of his diabetes and a lower weight (Exhibits 3F and 9F). Treatment records from February 2014 revealed an overall improvement in the claimant's condition including weight loss with a weight of 306 (Exhibit 9F/1). The record also revealed a continuation of the treatment plan including the use of medication for the treatment of the claimant's diabetes (Exhibit 9F/1). The undersigned has found this evidence consistent with the claimant's testimony from the hearing regarding his reduction in adverse symptoms when he was compl[ia]nt with his treatment plan. The undersigned has found that by the date of the hearing that the claimant had reduced his weight to 270 pounds from a high of 350 in September 2012 (Exhibit 3F).

. . .

Regarding the claimant's vision, the undersigned also found that the medical evidence revealed that this impairment would not prevent the claimant from working. The undersigned has noted the findings of consultative examiner Dr. Michael J. Dieckhaus from October 2012 (Exhibit 2F). Dr. Dieckhaus found the claimant had an uncorrected visual acuity of 20/30 in each eye (Exhibit 2F/1). He also found the claimant had a large alternating exotropia but would fixate equally with each eye for short periods of time and would routinely switch between the two eyes for fixation. Dr. Dieckhaus opined that this large exotropia had been present since the claimant's birth but that he had excellent visual acuity with only mild spectacle correction (Exhibit 2F/2). Dr. Dieckhaus stated that the claimant would not be able to perform jobs that required depth perception but that his central visual acuity and peripheral vision would not preclude him from performing many other jobs (Exhibit 2F/2). Dr. Dieckhaus also noted the claimant's history of diabetes but stated that the claimant did not have any diabetic retinopathy (Exhibit 2F/2). . . .

4

On October 16, 2012, Dr. Christopher Fletcher, a State agency physician, reviewed the claimant's medical records. Dr. Fletcher noted the claimant has physical impairments of diabetes, obesity, and exotropia. Dr. Fletcher indicated the claimant could perform a limited range of medium work based on those physical impairments. He said he could lift and/or carry 50 pounds occasionally and 25 pounds frequently. Dr. Fletcher stated the claimant could stand and/or walk for 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. In addition, Dr. Fletcher pointed out that the claimant could frequently climb stairs and ramps due to his obesity. He noted the claimant has visual limitations in depth perception due to the large angle exotropia. Otherwise, the claimant has 20/30 vision in both eyes (Exhibit 1A). Also, Dr. James Millis, another State agency physician, reviewed the claimant's medical records and he made the same findings that Dr. Fletcher noted (Exhibit 3A).

Regarding the claimant's bipolar disorder and PTSD, the undersigned has found that the medical record revealed improvement when the claimant was compl[ia]nt with his medication (Exhibit 8F and 10F). There was also a pattern of stable GAF scores when the claimant was following his treatment as directed (Exhibits 4F and 10F). Treatment notes from October 26, 2012 from United Neighborhood Health Services revealed . . . diagnoses of bipolar disorder, PTSD, insomnia, and a GAF score of 58 (Exhibit 4F/2-3). The claimant reported some improvement with his bipolar symptoms with the use of Lithium (Exhibit 4F/1). On examination, the claimant was noted as having average intellect with labile affect and mood. His reasoning was noted as fair but he had poor judgment and insight (Exhibit 4F/2). However, the claimant denied suicidal and homicidal ideation. The treatment plan called for the claimant to continue on his medication with follow up visits to be set at a later date (Exhibit 4F/3). The undersigned has noted that the claimant experienced more adverse mental health symptoms such as anxiety, mood swings, and paranoid behavior when he stopped taking Lithium (Exhibit 8F). Treatment records from January 14, 2014, revealed that the claimant "overtook" his Lithium and experienced a toxic reaction. The claimant ceased taking Lithium after an emergency room visit and began experiencing more adverse mental health symptoms (Exhibit 8F/1). The record also noted that the claimant reported that the Lithium "really worked good" regarding reducing his symptoms (Exhibit 8F/1). The claimant was again diagnosed with bipolar disorder, prolonged PTSD, insomnia due to mental disorders, and assessed with a GAF score of 55 (Exhibit 8F/4). Treatment records from March 19, 2014 revealed that the claimant continued to have adverse symptoms when not taking Lithium (Exhibit 10F/2). The record also noted that Lithium had been "very efficacious" for the claimant's mood stability. The record also noted that the claimant had been reluctant to take any antipsychotic medications. The claimant reported some reduction in symptoms with the use of other medications but negative effects when he ran out of those medications (Exhibit 10F/2).

> In addition, Dr. Rebecca Joslin, a State agency psychological consultant, reviewed the claimant's medical records. Dr. Joslin noted that the claimant has a diagnosis of PTSD and bipolar disorder. She indicated that the claimant [has] moderate limitations in maintaining concentration, pace, and persistence. She said the claimant has moderate limitations in interacting with coworkers and supervisors, but he has marked limitations in his ability to interact with the public. Dr. Joslin also noted the claimant has moderate limitation in adapting to change in the workplace (Exhibit 1A). Also, Dr. Andrew Phay, another State psychological consultant, reviewed the claimant's medical records and reached the same findings that Dr. Joslin made (Exhibit 3A).

(Tr. 19–20, 25–28.)

### III. Analysis

#### A. Legal Standard

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether substantial evidence supports the agency's findings and whether the correct legal standards were applied. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). The Court also reviews the decision for procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id.* at 723. Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the

ALJ may be justified based upon the record." *Id*. (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The agency considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Miller*, 811 F.3d at 835 n.6; 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, the burden shifts to the Government to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile" *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the ALJ must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)). The Government can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, also known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc.*

*Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids function only as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the Government must rebut the claimant's prima facie case with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

### C. Santillan's Statement of Errors

Santillan argues that the ALJ erred by failing to: (1) properly consider and weigh the opinions of Deepa Parsh, M.D., and Millard Collins, M.D.; (2) properly consider and weigh the opinion of Brian Glass, A.P.N.; and (3) properly evaluate and assess the credibility of Santillan's testimony. (Doc. No. 15, PageID# 418.)

#### 1. Weighing of Dr. Parsh's Opinion

The SSA's standards for considering medical source evidence, set forth in administrative regulations, govern (1) the types of evidence that the ALJ will consider, 20 C.F.R.§ 404.1512; (2) who can provide evidence to establish an impairment, 20 C.F.R. § 404.1513; and (3) how that evidence will be evaluated, 20 C.F.R. § 404.1520b. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). The evidence considered includes medical opinions, which are defined as "statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis," physical and mental limitations, and what the claimant is able to do despite his or her impairments. *Id.* (quoting 20 C.F.R. § 404.1527(a)(2)). An ALJ weighs a medical opinion according to a process set forth in 20 C.F.R. § 404.1527(c). *Id.*

Medical opinion evidence is afforded weight based on its source. Generally, a medical opinion from a source who has examined a claimant receives more weight than one from a source who has not done so (a "nonexamining source"), 20 C.F.R. §§ 404.1502, 404.1527(c)(1), while an opinion from a medical source who regularly treats the claimant (a "treating source") receives more weight than one from a source who has examined the claimant but does not have an ongoing treatment relationship with him or her (a "nontreating source"), *id.* §§ 404.1502, 404.1527(c)(2). An ALJ must give a treating-source opinion "controlling weight" if the opinion satisfies two conditions: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If a treating-source opinion does not receive controlling weight, the weight it is afforded depends on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and supported by relevant evidence, *id.* § 404.1527(c)(2)–(6). If an ALJ gives less than controlling weight to a treating-source opinion, he or she must provide "good reasons" for doing so. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

Dr. Parsh is one of Santillan's treating physicians. His opinion should therefore receive controlling weight unless it is inconsistent with the record or not well-supported by medically acceptable practices. The ALJ instead afforded "little weight" to Dr. Parsh's opinion, reasoning that:

> Although a treating physician, Dr. Parsh's findings were not supported by the medical evidence of record. There were no objective medical findings in the medical record that supported the restrictive limitations as outlined by Dr. Parsh in Exhibit 6F. Dr. Parsh noted chronic pain in joints. However, there are no diagnostic or laboratory findings to support a conclusion that the claimant has chronic joint pain. For instance, the claimant complained of left elbow pain. However, an x-ray of the claimant[s's] left elbow revealed no evidence of fracture, lesion or soft tissue mass (Exhibit 3F/25).

(Tr. 29.)

The ALJ thus discounted Dr. Parsh's opinion on grounds that his finding of chronic joint pain was inconsistent with the medical record. The ALJ provided only one example of how the objective medical findings failed to support Dr. Parsh's opinion: an x-ray of Santillan's left forearm. (Tr. 29.) Although the ALJ correctly noted that the x-ray revealed "no evidence of fracture, lesion or soft tissue mass," the ALJ omitted that the x-ray did show "[e]nthesopathy olecranon at insertion of triceps tendon."[2] (Tr. 29, 275.) That finding—apparently ignored or overlooked by the ALJ—supports Dr. Parsh's opinion of chronic joint pain. The ALJ provided no other reasons to support of her assignment of "little weight" to Dr. Parsh's opinion beyond a general statement that Dr. Parsh's findings were "not supported by the medical record." (Tr. 29.) Such a sparse analysis does not provide the "good reasons" supported by record evidence that the regulations require to discount a treating physician's opinion. *See Gayheart*, 710 F.3d at 376–78 (remanding for failure to provide "good reasons" for discounting weight of treating source where ALJ failed to "identify the substantial evidence that is purportedly inconsistent" with treating source's opinions); 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Moreover, after determining that Dr. Parsh's opinion was not entitled to controlling weight, the

---

[2] Enthesopathy olecranon refers to the disorder of the muscular or tendinous attachment to the ulna at the elbow. *See Dorland's Illustrated Medical Dictionary* 561, 1173 (28th ed. 1994).

11

ALJ did not consider the seven factors that must be applied in determining what weight to give the opinion. 20 C.F.R. § 404.1527(c)(2) (establishing factors as the length of the treatment relationship, frequency of examination, nature of the treatment relationship, extent of the treatment relationship, supportability of opinion, consistency with record as a whole, and source's area of specialization). The ALJ's decision is therefore not supported by substantial evidence and is procedurally flawed. Remand is necessary for the ALJ to reassess Dr. Parsh's opinion.

## 2. Weighing of Brian Glass's Opinion

The ALJ also gave "little weight" to the opinion of treating advance practice nurse Brian Glass. Although Glass is not an "acceptable medical source[]" under the regulations, an ALJ must consider all relevant evidence in the case record. SSR 06-03p, 2006 WL 2329939, at *4 (Aug 9, 2006). The ALJ considers other medical sources in light of the factors listed in 20 C.F.R. § 404.1527, which "represent basic principles that apply to the consideration of all opinions from medical sources . . . who have seen the individual in their professional capacity." *Id.*

Glass opined that Santillan had a marked impairment in numerous work-related mental activities due to his mental health conditions. (Tr. 328.) Glass based this finding on Santillan's "chronic affective/mood disorder & anxiety disorder characteristic of mood instability w/ irritability, elevated moods at times/hypomania, periods of vegetative depression, poor concentration, sleep disturbance, paranoia and history of psychosis, social isolation and panic attacks/hypervigilance, sensitive startle reflex, history of suicidal ideation." (Tr. 329.) Glass further opined that Santillan would be "off task" 25% or more of each workday and would be absent from work more than four days per month because of his impairments. (Tr. 330.)

The ALJ found Glass's opinion not supported by the medical evidence of record. (Tr. 29.) In particular, the ALJ found Glass's opinion inconsistent with treatment records that showed Santillan experienced significant improvement when taking Lithium, including findings that Lithium was "very efficacious." The ALJ also cited Glass's treatment note from January 14, 2014, in which he recorded Santillan's report that Lithium "really worked good" at reducing his symptoms. (*Id.*)

Glass's treatment notes show that Santillan's condition worsened when he was not taking Lithium. Glass's January 14, 2014 treatment note states that, since Santillan stopped taking Lithium, "he has been more anxious, more moody, more paranoid, [and has experienced] poor sleep." (Tr. 331.) Similarly, Glass's treatment note from March 29, 2014, states that Santillan's symptoms have worsened since he stopped taking Lithium and that it "had historically been very efficacious for [his] mood stability." (Tr. 371.) Santillan points out that other treatment records indicate his improvement when medicated was only partial. For example, according to Glass's treatment notes from September 4, 2013, and November 16, 2013, even as Santillan had "[m]ostly stable moods" and largely unremarkable mental status exams while taking Lithium, he continued to isolate and suffer from anxiety and experienced "[m]inimal improvement" in response to his medications. (Tr. 335–37, 339–41.) On February 26, 2013, despite being compliant with his medication, Santillan reported depressive symptoms and episodes of anger and irritability. (Tr. 346–47.) Glass also noted that Santillan exhibited an "expansive" affect and "hyperactive" psychomotor behaviors while medicated.[3] (Tr. 348.)

---

[3] An expansive affect may be a symptom of the manic phase of bipolar disorder. (Tr. 337, 348.)

"The weight to be given to opinions from 'other sources' depends on the facts of the case, the totality of the evidence presented, and the probative value of the opinion." *Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015). The ALJ has "broad discretion in weighing such an opinion." *Id.* In the context of the factors to be considered in weighing any medical source's opinion, 20 C.F.R. § 404.1527(c), the ALJ's reasoning addresses the factors of the supportability and consistency of Glass's opinion. The ALJ did not expressly consider Glass's examining and treatment relationships with Santillan, Glass's specialization, or any other factors. *Id.* However, the ALJ did incorporate some of the limitations identified by Glass into Santillan's RFC. (*See* Tr. 23 (finding concentration, pace, and persistence limitations; limitations in Santillan's interactions with coworkers, supervisors, and the general public; and limitations in his ability to adapt to workplace changes), 328–29.) Because the record does contain substantial evidence that Santillan's condition improved when taking Lithium that is not addressed by Glass's assessment, the ALJ's affording little weight to Glass's opinion is within her broad discretion in considering the opinion of an "other source." *Brown*, 591 F. App'x at 451. Santillan has not shown reversible error.

### 3. Credibility Determination

Finally, substantial evidence supports the ALJ's determination that "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." (Tr. 24.) An ALJ may consider the credibility of a claimant's subjective complaints in assessing disability and, when supported by substantial evidence, this credibility determination must receive great weight. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). When evaluating the limiting effects of symptoms of a medically determinable impairment, the ALJ will consider all relevant evidence, including: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the effectiveness of medication or other treatment; and other measures to relieve the symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7P, 1996 WL 374186, at *2–3 (July 2, 1996).[4]

Although the ALJ found that Santillan's medically determinable impairments could reasonably be expected to cause his stated symptoms, the ALJ concluded that Santillan's subjective complaints were not entirely credible. (Tr. 24.) The ALJ correctly considered the appropriate factors in determining the weight to give Santillan's complaints. The ALJ considered Santillan's daily activities, which include preparing frozen meals and washing dishes, doing his own laundry when necessary, leaving his home to shop for food and attend doctors' appointments, and caring for his personal needs, albeit with some difficulty. (Tr. 25–26.) The ALJ found that Santillan's symptoms improved with medication and exercise. Santillan reported that his diabetes symptoms improved when he took his medication and monitored his blood sugar levels. (Tr. 25, 255.) Likewise, medication, including Lithium, helped reduce his mental health symptoms. (Tr. 25, 27, 261.) Santillan also reported feeling better when complying with his prescribed exercise regime. (Tr. 253.) Overall, the ALJ noted, the medical evidence was "consistent with the claimant's testimony from the hearing regarding his reduction in adverse symptoms when he was

---

[4] Effective March 16, 2016, SSR 16-3p superseded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). However, because the ALJ made her decision prior to March 16, 2016, the Court applies SSR 96-7p. *See Cameron v. Colvin*, No. 1:15-CV-169, 2016 WL 4094884, at *2 (E.D. Tenn. Aug. 2, 2016) (explaining that administrative rules do not apply retroactively absent an explicit statement of an agency's intent for them to do so).

compliant with his treatment plan." (Tr. 25.) Because the ALJ fully explained her credibility evaluation and supported it by citation to substantial record evidence, this claim of error is without merit.

**IV. Recommendation**

In light of the ALJ's error in weighing the opinion of Santillan's treating physician, the Magistrate Judge finds that the decision below is not supported by substantial evidence. The undersigned accordingly RECOMMENDS that the decision of the ALJ be REVERSED and the case be REMANDED for reconsideration of Dr. Parsh's opinion.

Any party has fourteen days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 20th day of February, 2018.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge